AO 91 (Rev. 11/11) Criminal Complaint (approved by AUSA Sean McDonnell)

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br><br>JERMAINE REYNOLDS<br><br>*Defendant(s)* | ) ) ) ) Case No. 17-1563-M<br>) )<br>) )<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __November 14, 2017__ in the county of __Philadelphia__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 922(a)(1) | Dealing in firearms without a license |
| 18 U.S.C. 922(g)(1) | Felon in possession of a firearm |

This criminal complaint is based on these facts:
SEE ATTACHMENT A

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Charles M. Ramsey, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __November 18, 2017__

_____
*Judge's signature* s/Linda K. Caracappa by JMcDowell (AUSA) per telephone authorization

City and state: __Philadelphia, PA__

Hon. Linda K. Caracappa, Chief Magistrate Judg On Nov. 18, 2017 at 4:00pm
*Printed name and title*

## ATTACHMENT A

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, Charles M. Ramsey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent for the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am currently assigned to ATF Philadelphia Group VII, which is a Firearms Enforcement Group whose primary responsibilities include investigating violent crime through the interdiction of firearms being possessed by violent criminals in Philadelphia, Pennsylvania. During this time, I have successfully completed the Criminal Investigator Training program (CITP) as well as the Special Agent Basic Training program (SABT). As a result of my training and experience, and that of my fellow investigators, I am familiar with investigations involving violations of federal firearms laws, and I am familiar with federal search warrants and searching for and seizing evidence in accordance with the probable cause set forth in supporting affidavits.

2. As a Special Agent with ATF, I am vested with the authority to investigate violations of Federal law, including Title 18, 21, and 26 of the United States Code.

3. As part of my duties, I participated in the investigation of targets RENARD GRAY and JERMAINE REYNOLDS, two residents of Philadelphia who have conspired to illegally deal in firearms without a license in violation of Title 18, United States Code, Section 922(a)(1). As detailed herein, the evidence adduced by this investigation has also established that REYNOLDS possessed a firearm after having sustained a felony conviction, in violation of Title 18 United States Code, Section 922(g)(1).

1

## PURPOSE OF AFFIDAVIT

4. This affidavit is provided in support of a Criminal Complaint and Arrest Warrant charging REYNOLDS with (a) dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1); and (b) knowingly possessing a firearm after having sustained a conviction for a crime punishable by a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1).

5. Section 922(a)(1)(A) provides that it shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

6. As used in Section 922(a)(1)(A), "engaged in the business" means: "[a]s applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms...." 18 U.S.C. § 921(a)(21)(C). The phrase "with the principal objective of livelihood and profit" means "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).

7. Section 922(g)(1) provides that it shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

8. I am familiar with the information contained in this affidavit through my own investigation and/or from my discussions with other law enforcement officers and witnesses. This affidavit is intended to show that there is probable cause for the requested arrest warrant. It does not contain all of the information known to me or developed in the course of the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

9. ATF commenced an investigation into GRAY and REYNOLDS in June 2017 after receiving information from a confidential source that GRAY and REYNOLDS had been offering for sale and selling firearms without a license. After a period of observation and investigation, ATF succeeded in introducing GRAY to an undercover law enforcement officer, referred to here as UC, who was then posing as a private citizen interested in purchasing black market firearms.

10. GRAY and UC first met in September 2017. During their initial meeting—which was covertly surveilled and recorded by ATF—GRAY and UC discussed potential firearms transactions as well as the manner by which GRAY and his co-conspirators trafficked guns into Philadelphia. Among other things, GRAY told UC that he had a firearm supplier who could only be dealt with over the telephone, who was responsible for shipping guns to Philadelphia. GRAY further stated that another co-conspirator was "up here." According to Gray, this person held guns for him and was "my right hand man." "To ya'll," Gray told UC, "it's the same group of people." After some further discussion, Gray agreed to sell firearms to UC and provided UC with a telephone number at which GRAY could be reached. Later that same day, GRAY called UC and the two agreed to meet within a few days to conduct a firearms transaction.

11. On September 19, 2017, GRAY and UC spoke again, and the two planned to meet to conduct a firearm purchase transaction. The two met soon thereafter, as planned, and GRAY provided UC with a tan plastic bag and a cardboard box containing two semiautomatic pistols. UC

complained that he/she had understood GRAY would be bringing more guns, and GRAY responded by saying that he had planned to bring more guns but had sent some "back" because he wanted better guns. In exchange for the two pistols, UC provided GRAY with $1,100 in pre-recorded government funds. The two also discussed transacting more firearms in the future before GRAY took the money and departed the area. This transaction was covertly recorded by ATF.

12. On September 23, 2017, UC received a series of text messages from GRAY, which included a picture of six handguns and a request that UC contact GRAY as soon as possible. A few minutes later, UC received an incoming call from GRAY. During the call, GRAY stated that he could sell UC five of the six guns from the picture he had just texted. UC said he was interested, and GRAY responded that he would check with "his boy" because he wanted to "grab them jawns." The two agreed to meet later in the day to conduct the gun transaction. Based on my training and experience, in this context, "jawns" refers to firearms.

13. Later that afternoon, UC sent a text message to GRAY, asking if GRAY had the guns. GRAY responded by text, providing an address for the meet location. The two planned to meet at 4:30 p.m. At approximately 4:27 p.m., ATF agents observed a black Audi SUV, known to belong to GRAY, drive up and park in front of a residence on the 300 block of Walnut Lane in Philadelphia, which belongs to REYNOLDS. According to county probation and parole records, REYNOLDS has listed 329 E. Walnut Lane, Apt. 1, Philadelphia, PA, as his primary residence and reported from that address until his probation expired in April 2016. ATF has also consistently observed REYNOLDS at this location using electronic and human surveillance.

14. GRAY then exited his vehicle and entered REYNOLDS' residence. Roughly 10 minutes later, GRAY exited REYNOLDS' residence holding a yellow plastic bag that appeared to be weighed down by objects inside. GRAY's Audi SUV was thereafter observed leaving the area.

4

15. At approximately 5:24 p.m., investigators observed GRAY's Audi SUV arrive at the place where GRAY and UC had planned to meet. UC was already waiting at that location. GRAY exited his vehicle with a yellow plastic bag in his hand, walked over to UC's vehicle, and entered the passenger side. Inside the yellow bag were four semiautomatic handguns. GRAY explained that the two other guns pictured in his text had already been sold to others. He then provided the four firearms to UC in exchange for $2,800 in prerecorded government funds. GRAY exited UC's vehicle, reentered his Audi SUV, and departed from the area. This transaction was covertly recorded by ATF.

16. On October 18, 2017, GRAY and UC met again at a prearranged meeting place in Philadelphia, and conducted another purchase transaction of two firearms. ATF observed GRAY arrive in a white Chevrolet van prior to the transaction. He was not alone. Another male, later identified as REYNOLDS, was with GRAY inside the vehicle. GRAY exited the van and entered UC's car. GRAY then gave UC a plastic bag containing two handguns. In exchange, UC gave Gray $1,350 in prerecorded government funds. After the transaction, GRAY reentered the van and he and REYNOLDS departed the area. This transaction was covertly recorded by ATF.

17. On November 14, 2017, UC received another call from GRAY, in which the two discussed additional firearms transactions. During the conversation, UC asked when additional firearms would be available for purchase. GRAY responded that his out-of-town contact had just "sent something up." GRAY further stated that he was unavailable to meet, but his in-town co-conspirator could meet with UC and sell him/her firearms. According to GRAY, his in-town co-conspirator had "just picked up" ten firearms. GRAY added, "if you want to meet up with him, you can meet up with him, but you've got to do it like now or he's going to do what he do." GRAY and UC had additional calls over the course of the day, as the two attempted to schedule a purchase

transaction. During these calls, GRAY reported that his in-town contact—who GRAY identified as the "boy from Germantown" and "my right hand"—had already sold some of the ten firearms to other purchasers, but still had several firearms available for UC to purchase. REYNOLDS' residence on Walnut Lane is located in the Germantown neighborhood of Philadelphia. During the calls, GRAY also identified his in-town contact as the same person who was with in the white van during the transaction that took place on October 18, 2017, who ATF had previously identified as REYNOLDS.

18. At approximately 3:29 p.m. on November 14, 2017, GRAY called UC and told him that his in-town contact was on his way to meet with him. A few minutes later, ATF surveillance units observed REYNOLDS arrive at the prearranged meeting place driving the same white Chevrolet van that had been used in October 18, 2017 transaction. REYNOLDS was alone in the van. As surveillance units looked on, REYNOLDS exited the van, and entered UC's vehicle. REYNOLDS then handed UC a brown paper bag, containing four semiautomatic pistols. In exchange, UC provided REYNOLDS with $3,200 in prerecorded government funds. After the transaction, REYNOLDS departed the area. This transaction was covertly recorded by ATF. One of the firearms purchased in this transaction had been reported stolen out of East Point, Georgia, on November 6, 2017, only eight days prior to REYNOLDS selling the gun.

19. At all times relevant to this investigation, neither GRAY nor REYNOLDS held a license to sell or deal in firearms. In fact, REYNOLDS is prohibited by federal law from even possessing a firearm because he has been previously convicted of a felony. According to records obtained from the First Judicial District of the Commonwealth of Pennsylvania, REYNOLDS was convicted in April 2011 of carrying a firearm without a license, a class three felony, which carries

a maximum penalty of five-years imprisonment. As such, REYNOLDS cannot now legally obtain or possess a firearm.

## CONCLUSION

20. Based on the above information, and my experience and training as an ATF special agent, I believe there is probable cause to arrest REYNOLDS for (a) dealing in firearms without a license, in violation of Title 18, United States Code, Sections 922(a)(1); and (b) knowingly possessing a firearm after having sustained a conviction for a crime punishable by a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1).

Respectfully submitted,

CHARLES M. RAMSEY
ATF Special Agent

Subscribed and sworn to before me this 18th day of November, 2017,

s/Linda K. Caracappa by McDonell (AUSA) per
HON. LINDA K. CARACAPPA telephone authorization
United States Chief Magistrate Judge on Nov. 18, 2017
at 4:00pm

7